Our next case for oral argument is Rankin v. Palmer, counsel. Good afternoon, Your Honors. Jason Carr, appearing on behalf of petitioner-appellant Alvin Rankin. Brings this challenge pursuant to 28 U.S. Code 2254, a Nevada State prisoner. Your Honor, there's no question that the road to acquire 2254 relief is a hard one. Some of the highest standards, the hardest to traverse standards that I know of under the law to acquire a writ of habeas corpus. But in this case, there are three factors that assist me in that endeavor, and I'd like to discuss those. The first, regarding Ground 2, which is a substantive claim, is that the Nevada Supreme Court, the Federal District Court, both found that constitutional error occurred in this case. So this is a harmless error case, at least as it pertains to Ground 2. The State doesn't contest that either. It's a prejudice case. Excuse me? It's a prejudice case. It is a prejudice case, exactly. Well, I mean, that's the issue. At least half the burden has been accomplished here. Yes. But the Supreme Court, as we know, has given us some recent guidance, and Davis v. Ayala. Yeah, Judge Reinhart and I were on Ayala, so we know that. So I think Ayala makes it harder for you. Judge Reinhart may not agree, but we haven't agreed on that all the way. But the Supreme Court does see, doesn't Davis stand for the State court's harmless error determination as subject to antipodeference, and why doesn't that make a difference in this case? I would say that's the major change. Can I get to that? Are you conceding that on the second issue, that the Ayala applies to the second issue? I understand the first issue. Can you explain to me what the second issue is? Yeah, I hope so. The second issue is about the test of the clothing. I'm having the right case at the moment. I thought you were talking about the cross-examination on the second issue. I'm sorry, that's ground two. I guess what was your second issue, when you were saying the second issue, I think? Right. The second issue is the IAC, which is intertwined with the first ground for relief, the first assignment of error. But it's ineffective assistance for not conducting the test. Then the second issue would be IAC. Yes. So I would argue Davis v. Ayala doesn't apply to the second issue. But in the beginning, I stated there are three factors that assist my endeavor here. And on the IAC claim, the district court found, and it's well supported by the record of the Nevada Supreme Court, did not address the IAC issue, even though it was fairly presented and exhausted. And the federal district court found that there's no deference because the Nevada Supreme Court did not address the issue, even though it had the opportunity. So I'm not in an IAC situation of double deference. It's a de novo review of that IAC issue. And that is of substantial assistance to me as well. But it is, as Judge Tshishima questioned, that Davis v. Ayala does not apply to that. It's not a harmless error analysis. In the Strickland context, that just doesn't apply, the Chapman-Brack analysis. The third thing, though, to get to this, and this ties in to the Davis v. Ayala change, which I think, if you read Davis, well, I don't think, but if you read Davis v. Ayala, the Supreme Court basically says that there really is no Chapman-EDPA level that the district court or this Court needs to get into to determine whether or not the State court's decision, and in this case, you know, that decision, the meat of that decision is going to be found on ER, EOR, page 50, the Nevada Supreme Court decision. There is no — that the Brack error does subsume the Chapman-EDPA analysis. But what Davis v. Ayala did stress, and may be a change in this Court's jurisprudence, is that you do have to give deference, you do have to base your analysis on what the highest State court, in this case the Nevada State court, said. So I suggest we do that. If we look at what the Nevada Supreme Court had found, constitutional error here, it found it harmless beyond a reasonable doubt under Chapman, specifically saying that it was harmless beyond a reasonable doubt. And it did so based on two factors, which I would suggest to this Court are unreasonable. The two — this is a case where there's no forensic evidence, where the defendant never confessed at all. In fact, he steadfastly protested his innocence. The only evidence the State has is the eyewitness identifications and this highly questionable evidence about the client's — my client's, Petitioner Rankin's disappearance approximately 0.4 miles away from the scene of the robbery. And I'd like to discuss those both in turn. Well, so he is in the area. It's not like he was in Europe when the robbery happened. This is a highly — this is a highly dense residential area of apartments. I mean, there's a lot of people in this area — there's going to be a lot of people in this area, even at midnight on a Saturday night. So the fact that he is found walking on a road in this area is not in itself significant at all, I would submit. And he was not running, by the way, when he was found on the perimeter by law enforcement. He was walking down the road and — I would say it's not determinative. But you can't say it's not — that it has no significance. Little significance. Yeah. The — so eyewitness identification. Let's look at that. And one thing that defense counsel did do in this case and was not ineffective about — although the defense counsel at trial was the second counsel, it was actually the second counsel, my client testified at the evidence you're hearing that he never came to see him before trial at all. But anyways, putting that aside. The expert, Dr. Schumer, testified about these eyewitness identifications. And he said that they were — that in general, an eyewitness identification under the situation of a robbery, identification of a complete stranger, is going to be highly suspect. But there are factors at play in this case which make it even more suspect, in fact, not reliable at all. And what are those factors? The factors in general and factors that apply to this case divided attention. In this case, there are two robbers, not one. Highly salient factor in finding that the eyewitness identification testimony was not reliable. And by the way, even though the vast — But that's a good thing for your client, that they allowed the expert, because some judges don't allow the expert, and the jury didn't buy it. Well, they — well, they didn't buy it because the defendant wasn't able to present his complete defense. And if he had been able to get into the forensic — the insufficiencies of the police investigation, with the fact that they could have — Okay, but they — you can't — hyperbole is not your friend. They could have believed that the eyewitness testimony was wrong, and your client could have been acquitted. But maybe you're saying you could have presented a better case. I get that. But we don't know why they didn't. But they didn't obviously believe the misidentification with what they heard was wrong, or they wouldn't have convicted him. They didn't have all the facts and evidence. Under the BRAC analysis, I mean, there's — we have to analyze there's error, and did that error have a substantial injurious effect on the jury's verdict based on the evidence at trial? And certainly it aids my cause that the state's evidence at trial is weak. It's borderline, at best. And we do know that science — Well, it's an eyewitness case. And so by virtue — and you have three different eyewitnesses, correct? Only one of which even the district court found to be reliable at all. Well, but I'm just saying, all right, we have to look at the — you have to look at the evidence for what it is. You can say it's unreliable or whatever, but there were three people in court that identified your client, correct? And then one person — One of which for the first time. One person identified him in a show-up after, and he's found in the general vicinity. And that person that identified him in the show-up was shown some other people at different locations too and didn't pick those people out, right? Am I wrong? I'm not raised, but yes. Okay. So, but — and the doctor talks about this. Dr. Schumer about even — he looked at all the evidence. He looked at the factors and said these eyewitness identifications should be given very little weight, which is exactly what we're looking at, was the weight of the state's evidence. Because of the divided attention, because there was a weapon, especially in Victor Sanguin's face, that he was actually impacted in the back of the head with a weapon. And injury during the time of the identification makes it more suspect. That, once again, there's more than one person. Relative darkness, the amount of darkness is a matter of some trial controversy, but it was certainly dimly lit, if not outright dark in this area. And the fact that it's cross-racial. And it was a highly stressful, life-threatening situation. And when Dr. Schumer said, under those circumstances, all those factors which line up in this case, the eyewitness identifications, are entitled to very little, if any, weight. Let me ask you this, because you're beginning to run out of time. What is—you're talking now about the issue of not testing the clothing, right? That's the IAC issue. But they're related, because the ground— the first issue is that defense counsel should have been able to cross-examine the law enforcement. Let's take them one by one. The issue of not testing the clothing, how do you show that that is prejudicial? If that evidence had came in, it would have changed the entire tenor of the defense. The evidence that they didn't test the clothing? Right. Because as the district court found, based on the facts that were presented at trial, it's highly likely that had Rankin been there, even if he isn't the shooter, it's kind of disputed whether he is or not. The state argued he was. But even if he wasn't the shooter, he was in close enough proximity that that test would have yielded a result. And if that result had been negative, it certainly would have been exculpatory evidence in his favor, enough to tip the balance. What you were trying to show on the cross-examination is that they did crummy investigation, that they didn't test those things, right? Right. That's what you were trying to show on the cross. That's the significance of what you're saying was cut off, because it wasn't going to— I mean, you could have tested them. I mean, you. I'm saying defense counsel could have tested them. Anyone could have gotten them. I certainly would have. For sure, I would have. Well, no, but anyone could have. Any defense counsel could have. Each side has equal access. But what you were trying to show on the cross was that the police didn't, you know, they didn't do a good job. They should have tested those. And then you create reasonable doubt by saying, well, if they had to — you would have only shown they didn't test them. In this — Because they've never been tested to this date, right? Right. Within this high CSI era, like, yes, the law enforcement could have done this easy test, and, Jerry, you wouldn't be left with a doubt. The problem with this case is, of course, if you had been handling the collateral proceeding, you would have tried to show that the evidence would have helped him. There's nothing in the record that suggests anything about what testing the evidence, why it's prejudicial. Because he was handling his own case. How did he know that he should show that he had asked the public defenders to test it? But it's not in the record. He said he asked them. But there's nothing in the record that shows whether there would have been gunpowder on the clothing, and that the absence of gunpowder would have proved anything. All that the record shows is that the clothing wasn't tested. How does it show that that prejudiced him? You have to — The Court is right that the error of the magnitude of the constitutional error here is not as strong as it is in some circumstances. We're talking about a truncation of the cross-examination to prove that law enforcement did not conduct an adequate investigation of this crime. But I would suggest that, and the defense counsel made a good proffer on this, that had he been able to get into that cross-examination, it would have changed how he could have structured his entire closing argument, how he could have argued this case to the jury, and he could have stressed that fact that, look, these eyewitness identifications are unreliable. My experts explained to you how. They don't really have anything else. They could have brought you something else, but they didn't do it. And who should be responsible for that, ladies and gentlemen of the jury, but the State? It would have changed. It could have had a dramatic impact on how the entire case was presented, and there's really no way to tell that exactly. But I'm out of time, but I would like to point out that the Court is exactly right. If you look at the evidentiary hearing transcripts, specifically pages 318, 357, and 58 of the excerpts of record, Rankin, when he was brought to the evidentiary hearing, didn't even know it was going to occur, basically begged the Court for help with this. He said, I couldn't adequately present this case. I don't know how to do it. I do know that I asked for this testing. So there's inadequacies in the State court's factual process in this case. Yes, there is. And what's the remedy for that? Did he have a right to have an attorney? It's discretionary, but it is part of also the AEDPA analysis. If there's a dearth of factual findings in the State court record, that can be excused if the petitioner can prove that the State court did not provide adequate process for the petitioner to develop the facts. And is it fair to apply an attorney in a collateral proceeding, a constitutional violation? Under Martinez v. Ryan, it very well could be, and it's also presumed to be deficient performance at least in the cause and prejudice analysis when it's pro se, the petitioner. So it could be used to overcome defaults. There is a – it's not a pure constitutional right like the right, the right to memo write to counsel during trial, but it does have constitutional implications, the deprivation of counsel. But I'm far over time. I would like to have at least 30 seconds or so for rebuttal if the court will give it to me. Thank you very much. Good afternoon, Your Honors. Michael Bongard representing the respondents in this case, Jack Palmer and the Nevada Attorney General. I'd like to respond, first of all, to my opposing counsel's statement that the claims are intertwined. They're not intertwined. There was no claim of cumulative error presented, so this court's analysis and review of the claims have to occur independently. At this point, a claim of cumulative error would not only be unexhausted, but it would also be untimely under AEDPA. Probably what I'm most concerned about would be that, you know, cutting off the cross on this point, because I think – I mean, I was a trial judge, and I have to sort of, you know – I mean, I recognize I can't say, well, I would have done it this way or whatever,  so they are allowed to sort of attack what the prosecutor doesn't do in the case, sort of, or did you fingerprint that? Well, no, we didn't fingerprint it. So, you know, showing that there was a shoddy police investigation doesn't really exactly relate to the eyewitness testimony, but it's just one other area that they kind of – if someone wants to hang a hat on it, that you give it to them. So I'm inclined to think that it probably was error to cut that off, but how do we do the harmless error analysis here, and what impact does EALA have? And I agree with you, too, because I sit as a prosecutor in cases, and I have to deal with that on a daily basis, and then you start getting into the suppositions, well, you know, why didn't you fingerprint the pencil? And then you rebut it. You call someone back, and you say, well, not everything leaves a print or that it doesn't necessarily mean that, and that's just part of the way that it normally goes. It didn't happen that way. And, again, you know, that would have been the things that the prosecution would have said. Well, there's no evidence that he's close enough. There's no testimony that he would have been close enough as far as the gunshot residue. But I think the district court, to address directly your question, I think the district court said it best. Without that testimony, this was a case based on eyewitness identification and circumstantial evidence. With allowing that question and the negative, same case, case based on eyewitness identification and circumstantial evidence. So in this case where the answer is a negative, there really is nothing added. And the district court pointed out in its order that this isn't a case where the testing was done hindsight, and we have definitive results. Addressing it in the context of the harmless error, again, the basic answer to your question would have been, was it tested? No. That's point. And, sure, there would have been able to be some argument presented at closing, but, again, the state would have also had that opportunity to rebut that there was no evidence that he was close enough. There was no testimony that gunshot residue would have even been there. And even if you take into account what the state prosecutor said during the post-conviction hearing, that it was a stupid argument raised in rebuttal by the prosecutor that talked about him as potentially the shooter, we know that the jury didn't buy the fact that he was the shooter because they acquitted him on the attempted murder charge. With regards to the ineffective assistance, the counsel claim kind of shift gears. While the district court did the review de novo, the decision is still a court of deference because Strickland says that we have to look at counsel's conduct and we have to, number one, presume that counsel was effective, and, number two, you have to engage in presumptions that counsel's decisions fell into the wide range of strategic decisions. But that is counsel said he didn't remember ever being asked to do that. He didn't make a decision. He didn't say, well, I didn't believe. If he did, it would raise another question. If he said, I thought the guy was guilty. Well, what he did say, and this is at 345 of the excerpts of records. He gave a post facto explanation, but he didn't say that's why he did it. He said he didn't even remember being asked. I'm not criticizing this. I'm saying it wasn't his explanation. If you're saying his explanation was, I was afraid I would find bad evidence that would be harmful to my defendant, that would be a different issue. Right. So aside from the risks that he talked about, because, you know, he said, you know, if we did the testing and the testing came back positive, there goes my defense. If he said that, that would raise. That was one attorney said that, right? That was the trial attorney that said that, Mr. Percival, at 344 of the excerpts of record. But the district court judge, again, in making his factual findings, said, well, let's look at what else was there. Number one, the defendant did make a statement to the police, and he said something to the effect that I was just dropped off in the area, was with my girlfriend and a friend who dropped me off. I heard a commotion. I heard a gunshot. I saw my friend arguing with three Mexicans, and I went to talk, and then he had some kind of verbal encounter, and the district court said something to the effect, well, it certainly doesn't offend the laws of physics that he was running toward the gunfire instead of away from the gunfire. But, again, trial counsel was faced with that being there. We also know that because trial counsel would have had an opportunity to put on an alibi defense if he could find the girlfriend, if he could find the person that dropped him off, that certainly would have gone toward the misidentification defense, but it also would have gone toward things that counsel could do. That wasn't done either, and we know that wasn't, again, you can assume from the record that, because, again, Strickland allows you to make those presumptions, that those stories weren't true, and that, again, he knew that because of that, that his statement to law enforcement wasn't true, so that he probably was there. Basically, counsel had three options in this case. Number one, he could have done what he did and not had the evidence tested, which allows him to argue the misidentification defense. Number two, he could have had the testing done, and there would have been nothing found, which would have helped his identification defense, but also knowing that he's also open to rebuttal there because of the fact that you could have brought in all those questions that you didn't need to address because the court could have, well, how close was he, will that rub off, you know, how far away was he, and that was something that the district court could really only approximate because he talked in one of the footnotes about, you know, the width of the, was it a pre-2005, Malibu was five and a half to six feet. The third option, again, testing and the residue's gone, blows his case out of the water. So he took a safe avenue, and again, because Strickland allows us to make those presumptions, that was a sound strategic decision by counsel, maybe not the best, and I would like to, even though, to differentiate from the decision that you wrote in Harrington, it's not the same posture, you know, before it went up to the court because in Harrington, they went back and did the testing. You know, they found that the blood in that case, there was contamination that they couldn't, you know, rule out the possibility that Mr. Richter wanted to present. In this case, we don't have that, so we've got just the plain cold record, no further facts developed, and the district court, again, noted that, you know, there was no. . . Now, the defendant, did he or did he not testify at trial? Remind me. He did not. He did not, but there was no move to see if the clothing still exists. There was no move to have the clothing tested at this point, and the district court noted that, you know, because at this point, that claim was being decided de novo, not under 2254. Of course it wasn't. He made no move because he was, you know, he showed up in court. He was told he wasn't going to have a lawyer, and they said, go ahead. He didn't know what to do. The explanation of your opponent is that this is cause for prejudice. What's your position, if any, on the fact that the reason that there was no evidence is because he had no lawyer? At this point, my view is what the district court said in footnote 78 of the opinion, that at this point, they had the opportunity to develop that claim coming into federal court because it wasn't going to be applying under Ed POC, right, because it was a de novo review of this claim. But there was no request made to see if the clothing still existed. There was no testing done to see if there was actually going to be gunshot residue or not. But at this point, any of those claims being brought now, an exhausted, procedurally defaulted, you have to, you know, fix whatever hurdle that's going to be. But you also have a timeliness question now. If that truly is a new claim. Well, what if the defendant told his lawyer that he did do it, but he doesn't testify? Would you then, would defense counsel be, what if defense counsel then, you wouldn't want to test the, you know, you'd be afraid about testing that, right? Well, if I were in defense counsel's shoes, I certainly wouldn't have, because of the fact that you've got the silly, you've got the story of the defendant that doesn't make sense, as the district court said, kind of defies the laws of physics. What about the area? I know that it was argued that he was in the area. Counsel for the defendant said that wasn't really that significant. What was the area like at that time? Were there a lot of other people out there? I'm not from Las Vegas, so I don't know. I'm probably the opposite experience. No, actually, I'm from Ely, so it's a town of about 3,000 people. It's totally different. But one thing I would note of significance with regard to that, and it kind of directly contradicts what the expert on the eyewitness testing said, was that the testimony was that this was covered where the car was parked. At this point when, and the first robber with the gun approached as Victor and Mario were getting out of the one side of the car. Jesus was on the other side of the car where Mr. Rankin appeared. As they drifted toward the back of the car, which is where Victor got hit, and I would question that he probably wasn't hit seriously enough if he was one of the three that didn't go for medical treatment. But toward the back end of that, you're starting to get away from that cover, and the ambient lighting or whatever night lighting was in the parking lot is going to get better. Also, when he was facing Mr. Rankin was when the gun was pointed at the back. So he wasn't focused on the gun, which is what the expert said. So he had his attention on just Mr. Rankin. The other fact was that this identification was good because of the fact, and again the district court pointed this out, that he was shown five different suspects at three different points on the security quarter on the show up. The first time there were three people there. Victor didn't pick out anybody. The second time was where Mr. Rankin was, and he immediately identified him and said, yes, that's one of them. And then the third one, he didn't identify anybody else. So the court said that he wasn't under the pressure that he thought he needed to be to identify two. He got one. But the appearance, the disheveled clothing, the sweating, the profuse breathing, the panting, seeing his heart beating was consistent with the testimony of the brothers that they ran away. So, yes, the person that they found was going to be under exertion because he was at a minimum fleeing the scene, at a maximum crawling or hiding behind things or under things. Can I get back to my procedural question? Sure. You're suggesting that at the federal court hearing, they could have introduced evidence as to the prejudicial nature of the failure to test the clothing, and they didn't, but that it could have been introduced there? I'm saying they could have tried to raise a claim because at that point, the district court, the state courts decided the claim with paraffin and blood gunshot residue on his person. And they focused on that part of the claim that, well, it wasn't ineffective assistance to counsel because this counsel was appointed six months later. So that's why the court reviewed this claim de novo, because the Nevada Supreme Court kind of sidestepped this actual claim. I'm asking you whether you are stating that that evidence could have been introduced at the district court hearing and it was not. I'm saying that they wouldn't have been under any type of constraints under 2254 to do so. They would have obviously faced any procedural bars that we could have asserted, like exhaustion, like procedural default, like timeliness. But they weren't, but this claim at that point wasn't under that, is it 2254E, where you're stuck with the state court record. So they could have attempted to do all that, but they didn't do it. But you say they would or would not have been allowed to. They could have tried to. Well, anybody can try anything. Certainly. Okay, well, all right. Okay, if you don't. And I'm not sure. I don't know. I mean, I guess what I'm saying is that there wasn't the state court constraints that are put on by 2254 based on this claim because it was de novo review. All right. Thank you. All right. Thank you, Your Honors. First, the district court specifically found that the testing would have been relevant to exculpating my client, ER 34 to 35. That's a factual and legal finding the state has never challenged. This idea that I like to really say this, and this is the argument that you wouldn't test this because it would destroy your defense. Nobody who's ever tried a criminal case would ever make that argument. It is a ridiculous argument. Why is that? Because if the testing comes out not favorable to you, you have no obligation to turn it over. So you only have to turn over expert testimony and reports that you intend to admit at trial. It's a complete nonsense argument to say you strategically didn't test this because it may have come out badly for him. That argument makes absolutely no sense to me as a criminal defense attorney, and it is invalid. And I would just like to end here with, you know, we talked a little bit about my client, his problems at the evidentiary hearing in state court. But when he's talking, he's trying to cross-examine his second attorney, and this is what he says on page 346. He's asking about why his attorney didn't do the testing that he asked for. He said, I told you I was innocent. Why wouldn't you test it? I told you I was innocent. I had nothing to do with this. Why wouldn't you help me prove my innocence? This is what he asked his trial attorney. And this is a case that I'm asked all the time. How do you represent? I mean, aren't your clients guilty? Almost all of them are guilty. I mean, it's the reality. But there are the occasional cases. I've probably had, like, a dozen, 15 in my 17 years, where you really wonder, this person may be innocent. This is one of those cases. I mean, there is a real chance that this man is innocent. And that is something I would ask the court to take into consideration when it decides this appeal. Thank you very much. Okay. Thank you, counsel. The case is submitted. The court will take an afternoon recess.
judges: Reinhardt, Tashima, Callahan